PETERSON, Judge.
Florida Wood Services, Inc. (FWS), a materialman who furnished lumber and hardware to JM Construction Co., Inc. (JM), a subcontractor who was to perform framing and rough carpentry on a construction project, appeals the trial court’s discharge of its claim of lien. We reverse.
Osprey Links Joint Ventures (Osprey), the appellee and owner of the property against which FWS’s claim of Ken was filed, contracted with Royal American Construction, Inc. (RAC), a general contractor, to construct an apartment complex. RAC obtained the services of JM who began to perform while obtaining supphes from FWS. FWS timely and correctly served its Notice to Owner pursuant to section 713.06, Florida Statutes (1995). JM failed to complete the framing and rough carpentry, after having been paid $573,027.50, and failed to pay FWS all that it was owed for lumber and hardware furnished to the project. FWS then recorded its claim of Ken for $467,123.48 as aKowed by Section 713.08, Florida Statutes (1995).
Osprey then attempted to invoke the Notice of Recommencement provisions of Section 713.07(4), Florida Statutes (1995), by recording in the pubKc records an “Affidavit of Partial Abandonment and Intent to Recommence Construction” and a “Notice of Partial Commencement” relating only to the framing and rough carpentry portion of the project. The total amount ultimately paid by RAC to JM and others to complete the framing and rough carpentry was $2,677,435.65. JM’s contract with RAC was for $1,950,000. Osprey claims it should be reKeved of FWS’s claim of Ken because the amount remaining unpaid on the RAC-JM subcontract, $1,376,-972.50 ($1,950,000 — 573,027.50), should be offset against the cost of completion thereby leaving no funds with which to pay FWS’s claim.
When FWS sought to foreclose its lien, Osprey’s motion to discharge FWS’ claim of Ken was granted. The trial court found:
1. Osprey and RAC had a “common identity” because they were related entities. Therefore, Osprey was in direct privity with JM and could not be required to pay more than the contract price with JM, to wit: $1,950,000 to complete the framing and rough carpentry.
2. Osprey compKed with section 713.07(4), Florida Statutes (1995), by recording the Affidavit of Partial Abandonment and Intent to Recommence Construction.
3. Because Osprey had to pay more than the original price established in the contract price between RAC and JM to complete the framing and rough carpentry, no further obKgation existed to pay Kenors for unpaid claims.
4. FWS failed to properly respond to a request for a sworn statement of account pursuant to section 713.16(2), Florida Statutes (1995) and its president failed to observe the formaKties of giving the oath in that statement. The deficiency rendered void the earKer claim of Ken.
In an imaginative attempt to eompKcate a simple construction Ken dispute, Osprey argued successfully to the trial court that because Osprey and RAC were related, and shared a common identity, Osprey was in privity with JM. This concept formed the foundation for the next step of the argument.
*593 Osprey, now in privity with JM, could invoke the recommencement provisions of subsection 713.07(4), Florida Statutes (1995), file its “Notice of Partial Recommencement”, and eliminate any obligations to FWS because the cost of completing the framing and rough carpentry after JM defaulted was in excess of the original contract with JM. Osprey relied upon subsection 713.06(1), Florida Statutes (1995), in concluding that it could not be responsible to FWS for its $467,124 claim of lien. We admire the imagination used to formulate this concept but decline the invitation to adopt it, given its total lack of statutory or case law support.
A. COMMON IDENTITY
Osprey argues that it should be treated as having a direct contract with JM because it had a “common identity” with RAC, based on Aetna Casualty & Surety Co. v. Buck, 594 So.2d 280 (Fla.1992), rev. denied, 639 So.2d 976 (Fla.1994), and accordingly, is in privity with JM and entitled to offset based on the liability limits of the RAC-JM contract price.
In Aetna, the president and sole shareholder of both the owner and general contractor were the same individual. A materi-alman’s claim of lien was served only upon the general contractor and not the owner. The court ruled that service of the lien only on the general contractor constructively provided notice to the owner of the claim. See also C.L. Whiteside & Associates Constr. Co., Inc. v. Landings Joint Venture, 626 So.2d 1051 (Fla. 4th DCA 1993). The court also concluded that the constructive service rendered the claim effective because the owner and contractor had a common identity, to wit: the same individual is the president and sole shareholder of the two entities. This common identity concept was established in order to allow a lienor, who serves notice to an individual serving in a dual corporate capacity for both the owner and general contractor, to enforce its lien when no prejudice exists for failing to serve the owner. We do not find the concept of common identity applicable where as here, its use by the related parties who chose to make themselves separate entities would defeat the claim of a materialman who diligently and accurately followed the construction lien law. Such an inequitable result would frustrate the rationale behind the concept of common identity, i.e., to prevent the related parties from reaping a windfall.
B. RECOMMENCEMENT
Subsection 713.07(4), Florida Statutes (1995), provides:
713.07 Priority of Liens.—
(4) If construction ceases before completion and the owner desires to recommence construction, he may pay all lienors in full or pro rata in accordance with s. 713.06(4) prior to recommencement in which event all liens for the recommenced construction shall take priority from such recommencement; or the owner may record an affidavit in the clerk’s office stating his intention to recommence construction and that all lienors giving notice have been paid in full except those listed therein as not having been so paid in which event 30 days after such recording, the rights of any person acquiring any interest, lien or encumbrance on said property or of any lienor on the recommenced construction shall be paramount to any lien on the prior construction unless such prior lienor records a claim of lien within said 30-day period. A copy of said affidavit shall be served on each lienor named therein. Before recommencing, the owner shall record and post a notice of commencement for the recommenced construction, as provided in s. 713.13.
Even if we were to find Osprey’s common identity/privity argument persuasive, we interpret subsection 713.07(4) as prescribing a procedure that may be invoked when the owner has contracted with a general contractor and the entire construction project ceases, not when only a portion of the project ceases upon the default of a subcontractor not in privity with an owner. Throughout this “partial recommencement procedure” employed by Osprey, RAC never defaulted but continued to act as general contractor under its original contract with Osprey. The only difference before and after the “recommencement” in this case was that a different *594 framing and rough carpentry subcontractor completed JM’s obligation at RAC’s request and Osprey declined to satisfy FWS’s lien for supplies integrated into the job.
The notice of recommencement procedure cannot be interpreted in a way that allows the collusion of the owner and general contractor to defeat the claim of a materialman. Here, RAC failed to select a financially responsible subcontractor and may have failed to protect itself from JM’s supplier after it received a copy of FWS’s notice to owner in accordance with subsection 713.06(2)(a), Florida Statutes (1995). Osprey always had the opportunity to protect itself, after receiving FWS’s notice to owner, by following the statutory procedure for making proper payments.
Our conclusion is further supported by the terms of the contract between Osprey and RAC. Those terms provide that costs which would cause the guaranteed maximum price of $15,212,000 to be exceeded shall be paid by the contractor without reimbursement from the owner. When RAC’s subcontractor, JM, failed to complete its portion of the construction project, that failure did not impact the contract between Osprey and RAC; accordingly, RAC honored its obligation and continued with the construction by finding a replacement for JM. Osprey, however, reacted in a way not contemplated by subsection 713.07(4), Florida Statutes, which allows an owner to recommence construction if construction ceases before completion and further allows an owner to protect itself against liens arising before the cessation. Osprey, obviously desiring to reduce the economic loss for a group of related entities and more particularly RAC, treated JM’s default as a cessation of construction. In furtherance of this idea, it recorded the “Affidavit of Partial Abandonment and Intent to Recommence Construction,” a procedure not described either in subsection 713.07(4) or in any reported case. Osprey’s financial exposure should not have been affected by JM’s default since it was RAC’s obligation to deliver a completed project for the guaranteed price of $15,-212,000.
Accordingly, we reject Osprey’s attempt to create a “partial” recommencement provision under subsection 713.07(4), so as to defeat FWS’s claim of lien.
SWORN STATEMENT
Pursuant to subsection 713.16(2), Florida Statutes (1995), an owner may make a written demand upon any lienor for a written statement under oath of his account showing the materials furnished, the amount paid on account to date, the amount due, and the amount to become due, if known, as of the date of the statement by the lienor. FWS provided all this information in its sworn statement of account to Osprey. However, the deposition of FWS’ president revealed that he was not formally administered an oath by the attending notary when he signed the statement. The trial court found the claim of lien invalid for that reason. Subsection 713.16(2), requires that a statement of account be under oath. The same subsection was amended in 1994 to state:
The negligent inclusion or omission of any information deprives the person of his lien to the extent the owner can demonstrate prejudice from such act or omission by the lienor.
Laws of Fla. Ch.94-119. In light of the legislative amendment in 1994, the question becomes whether the owner, Osprey, was prejudiced or adversely affected from FWS’ president’s failure to obtain a properly administered oath. See Stunkel v. Gazebo Landscaping Design, Inc., 660 So.2d 623 (Fla.1995) (court construed claim of lien statute, section 713.08, which contained a similar provision that omission of details or errors in the claim of lien shall not “prevent the enforcement of such lien as against one who has not been adversely affected by such omission or error,” and held that failure of subcontractor’s president to take an oath when he signed lien claim required remand to determine whether faulty claim of lien adversely affected owners). Cf. Stresscon v. Madiedo, 581 So.2d 158 (Fla.1991) (court construed a pre-1994 version of § 713.16(2) which contained no language permitting lack of prejudice to be considered in determining the validity of a sworn statement of account and held failure to notarize otherwise valid statement of account is fatal to lien claim). Accordingly, upon remand, the trial court is *595 instructed to determine whether, by a preponderance of the evidence, Osprey was prejudiced or adversely affected by FWS’s faulty claim of lien. Stunkel at 627.[1]
CONCLUSION
We vacate the trial court’s orders finding that Osprey and RAC had a “common identity,” the conclusion of law set forth in paragraphs 16-18 of the “Findings of Fact and Conclusions of Law” dated August 27, 1997, the “Final Judgment on Counts 1, V and VII of the Amended Complaint” dated August 27, 1997, and the award of attorney’s fees to Osprey.
We remand to the trial court to:
1) Determine whether, by a preponderance of the evidence, Osprey was prejudiced by the omission of a formal oath in FWS’s sworn statement of account.
2) If Osprey cannot demonstrate prejudice, treat the claim established by FWS as a valid claim of lien and determine the extent of Osprey’s proper payments and whether Osprey has, or should have, retained funds from payments due to RAC in order to satisfy FWS’s liens.
ORDERS PARTIALLY VACATED; REMANDED.
GOSHORN, J., and ROUSE, R.K., Jr., Associate Judge, concur.

. Some comment is warranted regarding the trial court’s misplaced reliance on the strict requirement of an oath in the context of criminal cases where some interest of an individual is at stake. Specifically, the trial court relied on Youngker v. State, 215 So.2d 318 (Fla. 4th DCA 1968) (defendant's liberty interest at stake in prosecution for perjury based on his representations made in a waiver of lien; defendant successfully defended on the ground that his waiver of lien was not made under oath); Collins v. State, 465 So.2d 1266 (Fla. 2d DCA 1985) (defendant's liberty and privacy interests at stake in prosecution for trafficking in marijuana; defendant successfully defended on grounds that trial court erred in not suppressing the fruits of the search based on an invalid search warrant due to lack of oath by police officer who sought the warrant); and State v. Johnston, 553 So.2d 730 (Fla. 2d DCA 1989) (petitioner’s privilege to operate a motor vehicle at stake; court held that the arresting police officer’s failure to furnish the Department of Highway Safety and Motor Vehicles with a statement of probable cause under oath consequently did not provide the department with jurisdiction upon which it could proceed with any administrative action to suspend the petitioner's privilege to operate a motor vehicle). In these cases, the courts have strictly construed the requirement of an oath against the state and in favor of the individual whose liberty interests, and in the later case, whose driving privileges, were at stake. Such cases are different from the instant case which is a civil suit and what is at stake is the complete loss of an otherwise valid claim of lien. Indeed, such drastic loss of an otherwise valid claim of lien as has occurred in the past, see Stresscon, has been cured by the 1994 Legislative amendment to subsection 713.16(2).